The next case this morning, the court will hear is Amalgamated Transit Union Local85 v. Port Authority of Allegheny County, appellate number 21-1256. Good morning. My name is Greg Kroc. I represent the appellate, the Port Authority of Allegheny County. And if I may, I'd like to reserve three minutes for rebuttal. This case obviously involves a tremendously important First Amendment issue regarding the right of a government employer to prohibit its employees from engaging in political or social protest activities while they are on duty at work. This is not a case about an attempt for the government to silence First Amendment speech on the employee's own time outside of the workplace. Port Authority employees regularly and actively participate in social and protest activities in their communities and on social media. So we're only talking about what is done while the employees are wearing a Port Authority uniform as a representative of the government agency. We have a, I'm sure we each have a few questions for you. Just to make sure we understand what's in front of us, we have three employees who are disciplined. It appears there's a challenge to the, and they were disciplined pursuant to the July policy. There's the challenge to the July policy, and then there appears to be a challenge to the September policy. Just so we can make sure we know what's in front of us, is the challenge to the July policy mooted because now we have the September policy? We believe so. We believe it's mooted. And the reality is it doesn't matter. Because the reality is the only thing that was changed in the second policy, the only thing that was a further restriction, is speech that was, that's not protected under the First Amendment. The speech that's protected under the First Amendment, which is speech of a public issue, a social or protest or a political, that's always been prohibited. The only thing that was prohibited in the new policy is the mask with the Pittsburgh Steelers or the Philadelphia Eagles or a neon green mask. Now the Port Authority has enough masks that it can supply to its customers. So it doesn't really matter which policy is at issue. Okay. Next series of questions I have have to do with what is actually happening at the Port Authority in reality. And the reality is the Port Authority itself embraced the very message, the masks that these employees wanted to wear conveyed, which was support for the Black Lives Movement matter. We have it in the record in front of us, correspondence from an executive of the employer. And so how is it that it was okay for the employer to express a view on a subject of public concern, but it's not okay for the employees to do the same thing? Well, because government speech is different than speech on government property by a non-government. So Port Authority is a government entity. It's allowed to speak. And I think it was the Fields versus House of Representatives case that the Third Circuit has made clear that government speak, the government is allowed to speak. And what the Port Authority did is said, look, we support this movement. We do support it as an organization. And that's a message that Port Authority as a government entity is allowed to convey. But that's very different because that's a message it can control. It can send a message. If there is some problem on its vehicles or with its operations, it can rein that in and say, we're not going to do that any longer. But doesn't that undermine the argument when you're doing the, we'll assume it's either pickering balance or the first part of NTU's test? Undermine any kind of disruption in the workplace when the employer is conveying the same message as the employees? No. No, I don't think so, because the difference is once the government allows employees to speak on a subject matter, it has to allow other employees to speak on the same subject matter from different viewpoints. So our concern is not just the Black Lives Matter message. We're allowed to take a viewpoint because we're the Port Authority. We're a government entity. We can say this is our viewpoint on that subject matter. But if we allow other people, we allow employees to have their viewpoint, not just on that subject matter, but any social protest message, what happens when an employee wants to wear a mask with a Confederate flag? What happens when an employee, I mean, we've had employees threaten, I'm going to wear a White Lives Matter face mask. You know, so for our uniform policy, we don't have the luxury. Well, if it's government speech, we have the luxury of picking and choosing what the message is because it's our message. When it's employee speech, we don't have the same luxury of picking and choosing. We either have to allow. How do you, in fact, do that? Because there is a uniform policy that says no political or social messaging, and there's evidence in the record that individuals were committed to wear messages of support for particular political candidates and for other movements, including stronger than hate, et cetera. How do you reconcile sort of this inconsistency in what's permitted in the workplace and what's been precluded by not allowing the Black Lives Matter masks? Well, there was no evidence at the injunction hearing that port authority management was aware that people were wearing political buttons or stickers and allowed it to happen. There was testimony by long-term employees who'd been here for 20 and 30 years that over the course of their career, they've seen those type of buttons and those type of stickers, and they're unaware of anyone being punished. Port authority management wasn't aware of it. Nobody came and complained the same way someone came and complained to us with the mask. So there isn't evidence that port authority management was aware of violations of the policy and allowed it. Is there evidence that they did not know about it, given the way that it's being described in the record, that it was occurring? Yeah. A port authority's representative, the general counsel, said no one brought this to our attention. But I think there's a second point. I think we are comparing apples to oranges. I mean, the reality is, if I were wearing a small pin on my lapel right now, you may or may not be able to see it. Where is it on the uniform? How is it? Face masks are very different. We're talking about on your face for the entire shift. That's something you stare at. That's what you see. Whether someone might have had a pin or something at a various point in time, we don't deny that that very is likely to happen. But, I mean, we're talking about a face mask, which became an integral part of the uniform. They have to wear it for the entire time they're there. It's on your face. If I were wearing a face mask that had something right now, I'm pretty sure that you might see it. And, quite frankly, there was a dispute about whether face masks had to be worn in general. That was an issue and a concern. So I do think, with all due respect, whether someone got away periodically over the course of 30 years with wearing a political pin or a political message is very, very different than a mandatory face mask that has to be worn. What about the stronger than hate issues? The Port Authority was supportive of that message. Sure. But, again, that's one where – Kids were wearing messages of similar support. How do you distinguish that from the Black Lives Matter situation? Well, I mean, there are certain circumstances where if people say, hey, here's a message that, again, if the Port Authority wants to embrace it, particularly in communities, a lot of what Port Authority embraces is for a business purpose. Their buses go through those areas. So if it's something after stronger than a hate, the bus is in those communities. They'll embrace things for a – you know, if there's an Irish festival and a pride, they'll wrap the bus in it. That's a Port Authority message that they say, hey, we're going to adopt this viewpoint of our own. And if employees want to follow with that or not, that's the Port Authority's message. But, again, that's fundamentally different than, you know, if we allow political or social protest messages on face masks of the employees choosing. Let's stop for a second there. I want to ask you to move to the actual substance of the order, which is on appeal. Okay. As I see it, the district court strictly enjoined the Port Authority from enforcing its adornments and new uniform policies against Black Lives Matter and similar masks. Correct? Correct. So it's very narrow. Correct. Okay. And I know you made the argument that this could put you in a position of having to choose between viewpoints. But is our standard review of what the district court has entered here as a preliminary injunction – and you're going to have a fuller day, if you want it, going back from the district court – is that, you know, our standard review is that the district court abuses discretion in entering an order prohibiting the regulation that impacted the Black Lives Matter mask. So, you know, how is what the district court did an abuse of discretion? Well, I think, Your Honor, what we're currently forced with doing right now is we are essentially forced to engage in viewpoint discrimination. That's what we have to do right now. I mean, we've been told that we are supposed to allow that social protest message. Okay. But we're simultaneously allowed to review other messages and decide that if that viewpoint is more controversial or we think it's more problematic, we prohibit it. And that may be another day. That may be another day. But we're not at that day. We're at the appeal from this particular order. Right. But we still have to have a workable policy. We don't know what tomorrow – You have a chance to go back for the hearing in full on your complaint. We're strictly dealing with a preliminary injunction. Right. But I do still think at the injunction stage whether the entire balancing test and what evidence should have been put on our side of the scale is something we're allowed to address. All right. And which test is that since you moved to that quickly? Which test should we be using here? Right. Okay. I guess two points. Number one, I didn't want to leave your first question. I'll get to your test. All right. But keep in mind that part of what the court thought, and you're saying why this is an issue for us right now, even with the Black Lives Matter masks, let's assume we only address those. The court assumed incorrectly that our only interest in preventing Black Lives Matter face masks is physical confrontation and disputes on our vehicles. That's not true. We have a significant right in having an appearance of neutrality so that people who come onto our vehicle feel if they have to ask a question. We're on the property. They have to come up and tap a Port Authority representative. You know, hey, we've got an issue on the bus. There's someone hurt at this station. What mask they're wearing, if it's a Black Lives Matter mask, if that makes them less comfortable, less likely to see help, that's a significant interest that we're dealing with right now under the current order, even if we're only talking about Black Lives Matter masks. Was there evidence of that in the record before the district court, that that message caused that sort of reticence? Well, I mean, there wasn't evidence of a specific person bringing that to our attention, but we did have evidence that the Port Authority operator is the only person on the vehicle. We talked about having a welcoming environment, that type of thing. So I don't want to ignore your other question. No, and I don't want to stop you from answering the first one either, but all of that was in front of the district court. Your neutrality argument was in front of the district court. Right. And the district court found that there was not substantial evidence in the record to support that argument as being a basis to permit your policy. I didn't read the court's finding to that. I thought the court just ignored that entire issue and said, short of physical confrontation and dispute on Port Authority property. I mean, it was in the record. You put it in the record. You made the neutrality argument. Right. And that's why we're saying the balancing was not done correctly. All right. Then go to point two. Which test? Thank you. We believe that it is the NTEU standard, that there was some language initially that distinguished between an ex ante prohibition and an ex post punishment. But if you look at how that law has evolved over time, the reality is what that rule means in the heightened standard is, if you're outside of the workplace talking about topics unrelated to your work, common sense dictates that's not likely to impact, it's less likely to impact your operations. So that's why you have the heightened standard. But here we have three employees who are disciplined. That's Pickering. Right. And then we have the policy challenge, which seems to be NTEU. Do we have a situation here where Pickering applies to the propriety of the discipline and the NTEU test applies to an evaluation of the policy? And I'll talk about only the September one for the moment. Right. Some courts have actually done that. There are other circuits. But I think that doesn't make any sense. And, quite frankly, I think it was Justice O'Connor and her concurring opinion in the NTEU case that pointed out and said, look, that's kind of silly. I mean, you're making a decision based on what you think is likely to lead to disruption. And, quite frankly, it's often better to tell the employees up front, have a policy. Tell them what is appropriate and what's not so they know how to behave. And it really, you know, it kind of breaks down if you're looking at it that way. It makes a lot more sense under the standard, you know, to say, look, the deference that applies to Pickering should be if it's on-duty speech or if it's speech that pertains to the operations. That's why you have deference to the government employee. In response to Judge Schwartz's first question, you said you don't think it makes a difference whether we are talking about the July policy or the September policy. And I was a little surprised by that because the July policy, in that it proscribes political and social protest masks, runs into Mansky issues about workability and how do you define social protest and politics and all this. Why could, that one seems more troubling than a policy, which I understand is the September policy that says, here, everyone, wear this khaki plain mask or this blue mask. And you don't talk about politics and social protest, which is content and may inevitably lead to viewpoint. Just give everyone a khaki mask. Wouldn't that be easier? Right. And it most certainly is. It's a lot easier to enforce. And you don't get into those type of issues. But when you're talking about the Mansky case there, you're talking about public speech as opposed to employee speech. And courts are very clear that when you're governing employee speech, what might be too vague or might be too difficult is simply a very different standard. So courts have said, listen, you can go to employees and say, we have a rule that says you can't be rude to customers. And while that might be overly broad and not definitive enough in the context of governing the public speech, when it comes to employees, and that's why I said it doesn't matter, is that for us it certainly does make it cleaner. It makes it easier to promote. And we think we've got the right from our uniform to dictate exactly what it is. But I just meant from a First Amendment perspective, the new policy does not prohibit any more First Amendment speech than the old policy did. It prohibits more speech. It's easier to avoid those type of issues. But at the end of the day, it wasn't intended to, and we don't think it actually increases the prohibition on anything that actually is protected speech from the employees. We'll hear you back on rebuttal. Thanks. Good morning. My name is Joseph J. Pass. I represent the Amalgamated Transit Union and the plaintiffs and names plaintiffs in this case. I think that the court has appropriately zeroed in on the issues that we see also, and that is that the idea that you can put a mask policy or any policy that says you are prohibited from doing any speech of a political or social nature is on its face unconstitutional because public employees, the law is clear, have a right to speak on matters of public concern. And if you ban all speech, then there is no right to talk about public concern. And the courts are very clear. They talk about in order to ban the speech that the person is making, whether it's on the problem of while working or otherwise, the employer must show that whether the statement impairs discipline by supervisors, there's no evidence that it has or will, has a detrimental impact on the close working relationship for which personal loyalty and confidence is demanded, which certainly Black Lives Matter does not, and impedes the performance of the speaker's duties to interfere or interferes with the regular operation. The evidence here is just the opposite. The only comments that the employees had for five months while wearing these masks were good comments. And they're good comments. And keep in mind the other thing. Who do they serve? More than 50 percent of the population using mass transit are minorities. Forty seven percent of the operators are minorities. They are talking to their community. As he says, they have interest in the community. What the district court did, it looked at what happened over the last 50 years. And to say that the Port Authority did not know over the 50 years that there was social protest or people wearing buttons when they walk in and out of a cruise room every day and the supervisor sees them before they go out. And we have even pictures where the CEO is standing by one of the plaintiffs with an on and another social message. And they're going to come here and say to this court they didn't see it. I don't believe it. There was no evidence in the record that they didn't. They had one witness. They had no one from their garages come in and testify about whether they had seen things or had not seen things. It was one witness and one witness only. And that was the lawyer who represents the Port Authority, who when he testified about riding the bus, he said he didn't even look at the mask because the driver's face is moving forward ahead. It's a glancing blow. And in his words, he said very simply, I don't dress them down when I look at them. Neither does a patron. And this nonviolent expression of Black Lives Matter cannot be compared to what they have in their brief, a swastika. Well, we'll get to that in a second. I do want to do ask the same question. When he first came up, we want to know what the field is. We have the discipline challenge. We have the July policy. We have the September policy. My question to your adversary was, is the July policy challenge mooted by the fact that now the September policy is the operative policy? I would say it probably is. Yes, I do. And I think that the July. I'm sorry. The September policy is just as draconian as the judge. It's even more draconian because it prohibits everything. Couldn't they just give everyone here is a blue uniform like United Airlines. You don't get to wear any message mask. Part of the uniform is this blue mask. It matches your blue shirt and your blue pants. Wouldn't that what would be the problem with that? That is not a public employer. So they can do what they want as a private. I know I'm I'm saying couldn't the Port Authority give its bus drivers blue uniforms? They could. But the uniform itself, the pristine uniform, does what they're saying in that case. We want you to have a pristine uniform in order to stop you from speaking. That's the problem. Isn't that pretty much what the new policy is, the new uniform policy? Exactly. That's what it is. We don't want. And I think Judge Porter, in fact, you had in the free thought case pointed out that when you ban all speech, that is viewpoint discrimination for which it's illegal on his face. What if at the beginning of the pandemic there was an availability of supply of PPE? Right. And what if the policy was you got to mask up and you've got to wear a blue mask and that's it. Again, you have a claim. I mean, yeah. Would you have a claim today? Would you have a claim today if that was the circumstance? Mask mandate plus. Decor is blue mask. That's it. And we're going to supply it. Would you have a claim if people were wanting to wear the other mask? I think we still would, because it is a speech issue. It boils down to a free speech issue. Where does this mask fit in? All right. I mean, seriously. And for the for the record, we have a mask that is blue with gold letters. It's a pit. It will not be good. It will not cause disruption to the enterprise. That's the key. So you've said you've suggested they they could bar a swastika mask. I think they were. Yeah. They bar a Confederate flag. That's a good question. I think we're a mega mask. A what? A mega mask. I'm trying to. Oh, we're wearing Magnum. They were wearing Magnum hats. Where did where would you draw the line? Where would I draw the line? I think you'd have to weigh your ridership. You'd have to weigh whether or not it is something that society accepts. For example, if you had a mask that says kill all Jews, people aren't going to go for that. The First Amendment is it turns on what society accepts. I think that not necessarily because society needs to have debate, open debate, and there has to be differing views. So I'm not so sure that they are someone wearing a Confederate flag would be inappropriate. It's their view. OK. But again, keep in mind, when you talk about something like the Confederate flag, that's what caused the war between the states. Black Lives Matter is not causing wars. Black Lives Matter is trying to end the summer of September. Twenty twenty was pretty warlike in some cities, wasn't it? I don't disagree. But that has nothing to do with what the policy of this country is. This policy of the country is freedom for everyone. And sure, there are going to be disagreements with three thousand employees. It's there's going to be a disagreement. I don't know anybody. You can't get three people together that won't disagree on something. But you have to weigh what is the value of the speech. And that's what the courts say. The value of the speech versus the employer's right to say it is going to cause disruption. And then they have to tell you at least give you reasons why. But what we have here, we have the CEO of the company personally and as a part of the asking people, if you don't agree with the way black and brown people are treated, do something. And that's exactly what they did. She was like the canary in the mine. She went in and put that out into the public, got no negative reaction from anyone. But your adversary draws the distinction by saying that's the employer's speech, not the employee's speech. How do you respond? There was two. She had a tweet as the as she even noted. It's my personal view. And then she did it also as part of the court authority. She spoke as an employee, not as a manager. And that's where she urged people to do something. Follow me up on Judge Porter's question about line drawing. If we were to affirm this order in joining the Port Authority from prohibiting people from wearing masks, lots of double negatives. Next case comes and it's either the Confederate flag or has a white power message or something like that. What does the court do? What does the employer do? The employer looks at the situation to determine whether that will, using the three criteria that we look with the courts of our will it impair discipline? Will it be a detrimental impact? Will it be the performance of speakers? Do we interfere with the regular operation? So every message you're saying would have to go through those that analysis. That's what the courts have told us. Absolutely. That's exactly what they've told us. And the other thing you've got to keep in mind, they criticized John Ron John for looking backwards and saying, well, for five months, we don't have to look at and see that there was disruption. But this court said in I think it was Waters versus Philadelphia that we don't have to have actual disruption. But if we have a history that is probative evidence of what's going to happen. And here we have a history of people wearing social protest messages. We have the history of the CEO speaking and we had no disruption. So why would the employees wearing a mask, BLM, Black Lives Matter, be something that would be considered disruptive? I'd like to ask a question that Judge Fisher had asked your adversary about which case applies. Is Pickering applicable to the discipline and NTU applicable to judging the policy or is it something else? You read these cases, Your Honor, and I think it all boils down to Pickering is controlling. Even NTIU uses Pickering standards. So it does at the beginning and then it says. If it's a heightened standard, when you prohibit something going forward, that I think is true. Which one? I think the second case, the September is an NETU case. I think that's the standard. And for the discipline? The discipline would be the Pickering standard. And I assume that you're challenging the Pickering. I'm sorry. You're challenging the discipline imposed by these employees on its employees, even though they were paid because it has some potential later impact. Right. They were they were they were put off of work with pay. Correct. Right. And I just want to know why is that still a concern of theirs? It's their record, because if you get disciplined once, you get disciplined twice. It's a progressive system. That's what I wanted to ask. And the other thing that the my counsel, it doesn't the two standards run the risk of different results. I I'm not sure, Your Honor, if it does run the result. I don't think so. I think that even embedded in you is the Pickering standard. And that you go back to, is this a reasonable fear of disruption to the enterprise? No matter how you look at those. Do we need to decide that question as to which test to decide the case here? No, I don't think you do. I don't think you do. Judge Ron John, and you see he analyzed it under both standards and said it violated on both standards. And I would agree with that. It did. It has. One final thing I want to point out is the counsel pointed out about with the bus driver being the only one on the bus. So he has to face passenger. That's against the rule. If a passenger becomes unruly or has an issue, he has to immediately call a dispatch who will send over the Port Authority police or others. He's not to engage them. So that's not even an issue for this. The idea that they somehow are the captain of the ship or in response to Judge Porter's question about a plane uniform. All the cases that talk about the plane uniform have to do with paramilitary types of operation, policemen or people in the hospital down in the Fifth Circuit. There was a case about hospital employees, not into the general public, especially when you look. I think you've got to look at the context of all of this. Who are we serving? We're serving the general public and the majority of whom are not majority of whom are non-white. There is no one. I mean, there's the chances of disruption are essentially nonexistent, as we saw for five months. Thank you. If the if the Port Authority it's operating, it's a business. It's serving customers. If they looking forward, say to themselves, we're serving these customers. We don't want to have to wait for this. That's a confrontation. We know that some customers will be intimidated or annoyed by these masks, and they might be too timid to confront the bus driver. He is, after all, the authority figure on the bus. They'll just sit there and take it. They just want to get to from point A to point B. But it's still it's still for them an issue. Can't isn't that something that the Port Authority can take into consideration when I take these policies? I think we can take that in consideration. But again, I would refer back for five months. It went on and nothing happened. So you have to have some reasonable fear that that's going to happen. What is the reasonable fear that someone's going to do something when, you know, for five months? And so the fear would be the concern would be we don't want to alienate these passengers. They might not cause a disruption because they don't want to do that on a bus. It's not their bus. It's the Port Authority. It's the driver's bus, as it were. Why should we why should we subject our customers to this kind of messaging? I would answer that by saying in practicality, there's probably more disagreement about the fact that people wearing a mask than there is about what's on that mask. So if that's the case, then they should do away with wearing masks. There's always going to be some this I don't want to say disruption disagreements, but not if it's a black mask or a blue mask or not, if it's just a plain black mask like all his masks over there. No, I'm saying people will and have said, why are you still wearing a mask? That's we know that we hear it all the time. Why are we wearing masks? Because for safety and health reasons. But that doesn't mean anything. I mean, that's it seems to me there's very, if anything's more controversial, it's that than someone wearing a BLM mask. That would be my view. OK, thank you. I just want to make two quick points. As far as the appropriate standard, even under the heightened NTU standard, court authority should have one below, even under that heightened standard. The standard is not actual physical disruption on the property. The Third Circuit has said all the government needs to prove is that its concern is real and not conjectural. How do you establish real? The Third Circuit has said you have to point to evidence, something that happened that supports your belief. Doesn't have to be physical disruption, but something. We did that. Undisputed evidence. Number one, there were, in fact, riots and vandalism downtown Pittsburgh in the summer of 2020 at Black Lives Matter events. It occurred. It made the news. Number two, employees did complain. And there was clearly an exchange of hostile tension among employees on social media. You used employees plural complain. But one employee complained to us about a Black Lives Matter mask. We then saw other employee complaints in the social media where they were taking issue with other masks. They were taking issues with other masks. Well, with all of them. There was a blue thin blue lines mask. There was. So the reality is we had evidence of tension and hostility among employees. But how do you make you make that sound like tension and hostility? Isn't that supposed to be part of the robust debate? Not. But this isn't public property. This is not a First Amendment case where we've opened our forum to public debate and then we have to allow all viewpoints. As Judge Porter suggested, we're running a business. You know, a target doesn't have to allow this robust debate and their business. Although Port Authority is a public entity, it doesn't mean we have to allow that amongst our employees. They don't have to be made to feel uncomfortable at the workplace. And in today's society, social media is the water cooler. It is the break room. The fact that this did not physically occur on our property is irrelevant. So under that standard, we showed actual evidence of. That was justified our concern. But I want to finish with Judge Porter said, because the reality is, and I know, Judge Fisher, Port Authority is currently in an awful position with the current injunction order. We cannot wait until disruption occurs and then pick and choose and punish people after the fact. It's too late. We've got customers that are unhappy. We may lose employees over this. We face potential exposure, if something. So it's too late if we regulate it after the fact. And I'll leave you with what the United States Supreme Court said in Lehman versus Shaker Heights. They said, transit agencies are just a different business. We're not target. Our customers are captive customers that have no choice but to sit there and stare at whatever's on our property. So the U.S. Supreme Court said, as a subject matter, transit companies can prohibit political and social protest speech, period. Not the viewpoints, but the overall subject matter. So we're allowed to do that. And what the trial court did was the exact opposite. That judge said, those employees have a First Amendment right to force Port Authority's captive customers to stare at their personal social protest messages on our property. But in your brief, you talked about, I'm pretty sure there was a comment that said, we recognize we do not have a pristine uniform policy. Correct? Correct, remembering your brief that way. Correct? Well, not exactly. What we said was, the trial judge made the argument that almost suggested that the purpose for our policy is just to have a pristine, just for uniformity and crispness, and we want everyone to look. You don't have one, though. Am I correct? You don't have a pristine uniform policy because there are adornments that are used by the employees on different matters. Correct? Well, I mean, no, you're not supposed to wear political and social protest buttons. That's still a prohibition in our policy. You know, we don't know, you know, Port Authority management doesn't know that people are wearing that. That's not permitted. You know, if that's brought to management's attention that someone has a, you know, a political protest pin, if someone now has a sticker that says, let's go Brandon, which by when we filed our briefs, I wouldn't have told you, hey, that's a political message. What becomes a political or social protest message evolves over time, and we need to be able to have a policy in place that the union knows and that we know what it is in advance to avoid not just disruption but having people on our facilities, not just customers, contractors, suppliers, the public, all of our stakeholders, they need to feel comfortable on our property. And Lehman v. Shaker Heights says that the First Amendment allows us, period, to ban political and social protest messages on our property, whether it's an advertiser or whether it's an employee. The U.S. Supreme Court says we've got the right to do it. That's on a bus, though, correct? That's a bus. That case was in the bus. And the Supreme Court was pretty clear that the reason why that rule applied that way is because you've got no place to go when you're sitting on the bus and around you are these various messages. Am I correct? Correct. You're correct. But the reality is if you're sitting in the bus station, you're waiting for the bus on the platform, do you have any less discretion of where you have to be to get on? We also agree, however, that there's case where it says if the message is on the bus as it passes by, that's not problematic. I will agree that the public is not a captive audience when our bus drives by. Great. All right. Well, thank you for your arguments on both sides. Well-briefed, well-argued. We'll take the matter under advisement. Thank you. Thank you.